Dolores SWEENEY, Plaintiff,
Appellant,

v.

WESTVACO COMPANY, et al.,
Defendants, Appellees.

Dolores SWEENEY, Plaintiff, Appellee,

v.

WESTVACO COMPANY, et al.,
Defendants, Appellants.

Nos. 90–1178, 90–1258.

United States Court of Appeals,
First Circuit.

Heard Nov. 8, 1990.
Decided Feb. 12, 1991.

Charles M. Burnim with whom William Y. Christie, was on brief, for plaintiff, appellant.

Jeffrey F. Jones with whom Maxwell L. Stearns and Palmer & Dodge, were on brief, for defendants, appellees.

Before BREYER, Chief Judge, SELYA, Circuit Judge, and PETTINE,* Senior District Judge.

BREYER, Chief Judge.

The appeals in this diversity action arise out of Dolores Sweeney's claim that the defendants negligently caused her husband serious emotional suffering. The appeals focus upon two defenses. The first is that § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), pre-empts (and thereby forecloses) the kind of state-law tort suit that defendant Westvaco says is before us, namely a claim that an employer negligently caused an employee's emotional suffering through conduct arguably falling within the scope of a collective bargaining agreement. *See Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 407, 108 S.Ct. 1877, 1882, 100 L.Ed.2d 410 (1988). The second is that we lack jurisdiction to hear these appeals because the plaintiff and one of the individual defendants are both citizens of Massachu-

---

* Of the District of Rhode Island, sitting by desig- nation.

setts; hence, a prerequisite for diversity of jurisdiction, namely, complete diversity of citizenship between the parties, is missing. *See Strawbridge v. Curtiss,* 7 U.S. (3 Cranch.) 267, 2 L.Ed. 435 (1806).

Defendant Westvaco raised both these claims at the eleventh hour. It specifically made its pre-emption argument for the first time only after the jury returned a $1.5 million verdict for the plaintiff. It pointed to the jurisdictional flaw for the first time only after appeal to this court. We believe that, in this case, timing is all and that Westvaco made its arguments too late in the day to prevail.

Westvaco's pre-emption claim falls afoul of the rule that, where possible, a party must raise an argument *before* the jury retires instead of waiting until after it has seen the verdict. The Magistrate (who tried this case with the parties' consent, *see* 28 U.S.C. § 636(c)), thought this normal rule inapplicable because he thought the pre-emption argument was "jurisdictional," and could not be "waived." *See International Longshoremen's Ass'n v. Davis,* 476 U.S. 380, 391, 106 S.Ct. 1904, 1912, 90 L.Ed.2d 389 (1986). He listened to the argument, agreed with Westvaco, and set aside the jury's verdict. For rather complicated reasons that we shall explain, we disagree with the Magistrate about waiver.

Westvaco is, of course, free to point to a lack of diversity jurisdiction at any time. But the eleventh-hour nature of that claim leads us to grant the plaintiff's motion to dismiss the nondiverse defendant from the case, thereby restoring the court's jurisdiction. *See Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 109 S.Ct. 2218, 2225–26, 104 L.Ed.2d 893 (1989).

We have considered, and we reject, Westvaco's remaining arguments. Consequently, we order the jury's verdict for the plaintiff reinstated.

## I

### Preliminary Matters

### Facts

In October 1984 George Sweeney suffered a nervous breakdown. Dolores Sweeney, his wife, believed that Westvaco and three of its supervisory employees negligently caused that breakdown. She sued them for loss of consortium. The jury awarded her $1.5 million. The underlying facts, as the jury might have found them, include the following:

1. George Sweeney worked more than twenty-nine years for Westvaco, an envelope manufacturer. He rose to the position of head adjuster, responsible for several envelope-making machines.

2. George Sweeney had overcome a background of adversity (birth defects, deafness in childhood, loss of a parent), to become, in his adulthood, a conscientious, kind, and dedicated employee, liked and respected by his coworkers. He was happily married; he had no children. His work, in a sense, was his life.

3. In mid–1983, Westvaco began to implement a new policy mandating overtime when too few employees volunteered. George Sweeney began to worry about working overtime too soon after his regular eight-hour shift. He had lost four fingers in an industrial accident; he also had back problems. He feared that operating machinery after an eight-hour day would put too much strain on his back. He had often worked overtime voluntarily, however, and he was willing to work overtime on weekends, after he had a night to rest his back.

4. During Christmas week of 1983, George Sweeney refused to work overtime on several occasions. On December 28, 1983, his superior, Louis Ronzoni, gave George a verbal warning (later reduced to writing). George saw this action as a step that could lead to dismissal. He worried that he might lose his job.

5. During the course of the next few months, perhaps because George would not work regular overtime, perhaps because Mrs. Sweeney (successfully) appealed to higher management to honor George's medical excuse, Ronzoni, along with other supervisors, ha-

rassed, taunted, and humiliated George.

a. Richard Laffargue gave George the impression that he would not accept a doctor's certification that George could not work overtime except on weekends;

b. Laffargue told George to demonstrate, in front of his assembled co-workers, just how his lack of fingers put added strain on his back—an order that George took as an effort deliberately to humiliate him;

c. Lorenzo Sanchez and other supervisors taunted George for not being able fully to carry out his work responsibilities;

d. After Mrs. Sweeney appealed to management (over their heads), George's supervisors assigned particularly slow workers to work under George and put him in charge of machines particularly likely to break down;

e. Ronzoni and the other supervisors planned to demote George to work in the tool crib—a low-level job with no responsibilities other than handing out tools to other employees;

f. Ronzoni told George about his demotion by calling him into his office, and saying "You're all done," implying thereby that George had been fired, and then leaving George several minutes to think about this before explaining that George had, in fact, been demoted, not fired.

Although a simple summary description of these incidents may make any one of them seem to amount to no more than tactless behavior, in context, the evidence permitted the jury to find behavior of unusual callousness or cruelty.

6. George subsequently had a serious emotional breakdown. He cannot work or maintain ordinary human relationships. His wife has become, in effect, a caretaker (as one expert witness testified), like a wife with a husband who has Alzheimer's disease.

*Procedural Background*

Dolores Sweeney, a citizen of Massachusetts, originally brought this lawsuit in Massachusetts Superior Court against Westvaco alone. She charged that Westvaco negligently or intentionally caused her husband emotional suffering. She sought damages for her own loss of consortium. (At the time, Massachusetts law allowed such a suit. *See Ferriter v. Daniel O'Connell's Sons, Inc.*, 381 Mass. 507, 413 N.E.2d 690 (1980) (workers compensation statute does not bar an employee's spouse from suing the employer for loss of consortium due to injury to the employee).) Westvaco, a citizen of another state, removed the suit to federal court. In federal court, Dolores Sweeney added as defendants several of George's supervisors, one of whom (Ronzoni) now turns out to be a resident of Massachusetts.

As previously mentioned, the case proceeded to trial; the jury found in plaintiff's favor; Westvaco, making several arguments, including pre-emption, asked for a judgment notwithstanding the verdict; and the Magistrate accepted Westvaco's pre-emption argument (while rejecting the others). The Magistrate, on grounds of pre-emption alone, set aside the jury's verdict and entered judgment for the defendants. Both sides have appealed.

II

*Trial–Related Errors*

For purposes of exposition, we find it easiest to consider at the outset Westvaco's claims that it should win (*i.e.*, that the jury's verdict should have been set aside) even if it does not prevail on its pre-emption argument. Westvaco renews in this court three such claims of trial-related error. The Magistrate rejected each of these claims. And, we agree with the Magistrate that they have little merit.

First, Westvaco says that the Magistrate wrongly refused to submit to the jury a proposed instruction that reads as follows:

If the conduct of defendants ... toward George Sweeney was in accordance

with the terms of the collective bargaining agreement between the Company and the Union, or in accordance with the Provisions of the Guidelines for Filling Overtime Needs adopted pursuant to the collective bargaining agreement, then you must find for the defendants in this case. Conduct in accordance with the terms of a collective bargaining agreement cannot provide the basis for a claim of intentional and/or negligent infliction of emotional distress.

The Magistrate rejected this instruction because he felt it would confuse the jury, saying that it "raises more problems than it answers." In our view, the Magistrate had the legal power to reject the instruction. Parties have no right to an instruction that would confuse the jury. *See, e.g., Shane v. Shane,* 891 F.2d 976, 987 (1st Cir.1989). And, in the context of the case as argued, the Magistrate's reaction to the instruction—that it would confuse the jury—was reasonable.

For one thing, the language of the instruction is confusing. What, for example, do the words "conduct ... in accordance with" mean? Do they mean "conduct mandated" by the collective bargaining agreement? If so, the instruction does not seem to apply to any of the instances we mentioned in ¶ 5(a)–(f) of the facts above. *See* pp. 33–34, *supra.* Or, do those words mean "conduct of a sort that the collective bargaining agreement specifically states that management may engage in?" If so, the instruction seems to fit some of the instances listed in ¶ 5(a)–(f) (arguably, (a), (b), (d) and (e)), but not others ((c) or (f)). Or, do the words mean "conduct that the collective bargaining agreement does not forbid management to engage in?" If so, the record, as argued by the parties, does not permit us to determine which of the instances described in ¶ 5(a)–(f) the language would fit. In any event, what was the jury to do if it believed that some, but not all, of the incidents listed in ¶ 5(a)–(f) were "in accordance with" the collective bargaining agreement? The instruction does not say. We can find no closing arguments, trial arguments, or other circumstances that would have clarified to the jury just how it was to apply the instruction to the case.

For another thing, Westvaco did not explain clearly to the Magistrate the legal reason why it thought he ought to give the instruction or something like it. Counsel did tell the Magistrate that he thought it would be "inconsistent with Federal Labor Law which ... encourages the negotiation of collective bargaining agreements ... to permit Plant Managers to be held liable for acting strictly in accordance with negotiated collective bargaining agreements." Counsel also said, however, that he did not have "any authority" on the point and that it was an "interesting and unique question." He did not mention the word "preemption," nor did he elucidate the matter any further.

In light of these circumstances—1) counsel's failure to call the Magistrate's attention specifically and clearly to the important pre-emption issue (which apparently no one had previously mentioned in the case); 2) the confusing language of the instruction; and 3) counsel's failure to elucidate the matter any further—we conclude that the Magistrate need not have instructed the jury on the point of law. *See United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990), *cert. denied,* —— U.S. ——, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990) (" 'Judges are not expected to be mindreaders. Consequently, a litigant has an obligation "to spell out its arguments squarely and distinctly," or else forever hold its peace.' ") (quoting *Rivera–Gomez v. de Castro,* 843 F.2d 631, 635 (1st Cir.1988) (quoting *Patterson–Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990 (1st Cir.1988))).

■ Second, Westvaco complains that, when Mrs. Sweeney's lawyer cross-examined codefendant Ronzoni, he elicited the fact that Ronzoni had consulted as many as five lawyers. The Magistrate admitted the answer, presumably as showing that Ronzoni had likely prepared his defense, and probably his answers to questions, with care. Westvaco says that it suffered prejudice because these questions allowed plain-

tiff "to highlight to the jury that Westvaco is a large corporation committing significant resources to defending this case." The legal question posed on appeal is simply whether the Magistrate went beyond the broad powers given to him in Fed.R. Evid. 403 to weigh "relevance" against likely "prejudice." We conclude that he did not act unlawfully. The Magistrate gave the jury a cautionary instruction, which we must presume the jurors followed. *See Gutierrez–Rodriguez v. Cartagena*, 882 F.2d 553, 574 (1st Cir.1989). And, were admission of the answer error, in our view it would be harmless, so that it cannot lead to reversal. *See* 28 U.S.C. § 2111.

■ Third, Westvaco says that $1.5 million is too much and asks us to order remittitur. We may not do so unless, after taking appropriate account of the reaction of the trial court, which has seen the evidence and the parties first hand, we find the award shockingly high. *See Brown v. Freedman Baking Co.*, 810 F.2d 6, 11 (1st Cir.1987). The trial court did not find the award shockingly high. Considering that the Sweeneys had been happily married for years, that Dolores Sweeney's marriage has changed from a source of joy and comfort to a nursing, or custodial, relationship, and that the custodial relation may last many more years, we find the damage award high, but not "shockingly" so.

### III

#### *Pre-emption*

A. *Westvaco's Pre-emption Argument*

Westvaco's basic argument on this appeal is that the Magistrate correctly granted its motion for judgment n.o.v. because federal labor law pre-empted Mrs. Sweeney's state-law cause of action. Westvaco's two-part pre-emption argument (which it developed *after* the jury returned its verdict) runs as follows: First, to award Mrs. Sweeney a judgment, a court must find (through judge or jury) that Westvaco's (or its supervisors') actions were unreasonable. To do so, the court would have had to interpret the collective bargaining agreement. That is because the reasonableness of the actions that we set out above in ¶ 5(a)–(f), such as giving George Sweeney a verbal warning, requiring him (perhaps for safety reasons) to show how operating a machine might injure his back, assigning him particular employees and particular machines, demoting him to the tool crib, and telling him about his demotion, depend (in Westvaco's view) upon the extent to which the collective bargaining agreement gave Westvaco authority to carry out such activities.

■ Second, Congress has said that courts, when they interpret (or review determinations of arbitrators who interpret) collective bargaining agreements, must apply federal law. Indeed, they are to create a body of federal common law that applies to disputes arising out of collective bargaining agreements. *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957). The Supreme Court has held that federal labor law pre-empts state-law claims that "require construing the collective-bargaining agreement." *Lingle*, 486 U.S. at 407, 108 S.Ct. at 1882. And, lower courts therefore have held that tort actions similar to this one are pre-empted under § 301(a). *E.g., Douglas v. American Information Technologies Corp.*, 877 F.2d 565, 569–73 (7th Cir.1989) (intentional infliction of emotional distress under Illinois law); *Truex v. Garrett Freightlines, Inc.*, 784 F.2d 1347, 1351–52 (9th Cir.1985) (intentional infliction of emotional distress under California law). Of course, if a court can resolve a state tort suit without need to interpret a collective bargaining agreement, federal labor law does not pre-empt the suit. *Lingle*, 486 U.S. at 408–10, 108 S.Ct. at 1882–1884. But when the reasonableness of conduct is at issue, pre-emption of the tort action is likely, *see International Bhd. of Elec. Workers v. Hechler*, 481 U.S. 851, 862 & n. 5, 107 S.Ct. 2161, 2168 & n. 5, 95 L.Ed.2d 791 (1987); *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 215–16, 105 S.Ct. 1904, 1913–14, 85 L.Ed.2d 206 (1985), leaving the parties to whatever remedies the bargaining agreement (or, say, workmen's compensation) may provide.

## B. *Waiver*

■ The merits of the pre-emption argument, however, need not be reached here as Westvaco has a timing problem. Under ordinary procedural principles, Westvaco forfeited its right to raise the argument at all, by waiting to raise it until after the jury reached its verdict. *See* Fed.R.Civ.P. 50(b). The record makes clear that Westvaco did not alert the court to the problem. In its pre-trial memorandum, Westvaco told the court that the case raised "no jurisdictional issues," and it "agreed with plaintiff's statement" that the case was a simple tort suit that did not present "any unusual issues of law." Westvaco failed to mention the matter in its motion for a directed verdict. The Magistrate, who ruled on pretrial motions, conducted the trial, held a charge conference, and heard all the parties' arguments, wrote that Westvaco did not give "notice of any pre-emption issue" until after the jury returned its verdict and Westvaco filed its motion for judgment notwithstanding the verdict.

■ Westvaco says that its request for the jury instruction discussed at pp. 34–35, *supra,* amounts to earlier notice. But, as we already said, neither that instruction, nor any of the discussion concerning it, raised the issue of pre-emption with sufficient clarity to entitle Westvaco to a jury instruction on the issue. And, even if it had done so, that fact would not help Westvaco, because of its silence in its motion for a directed verdict. Ordinarily, a "party may not base its motion for a judgment n.o.v. on a ground that was not argued in its motion for directed verdict." *Systemized of New England, Inc. v. SCM, Inc.,* 732 F.2d 1030, 1035 (1st Cir.1984) (applying Fed.R.Civ.P. 50(b)). Except as we discuss below, there is no obvious basis for an exception here.

## C. *Westvaco's "Antiwaiver" Argument*

Westvaco argues against applying normal procedural principles on the ground that a 1986 Supreme Court case, *International Longshoremen's Ass'n v. Davis,* 476 U.S. 380, 106 S.Ct. 1904, 90 L.Ed.2d 389 (1986), makes its pre-emption defense nonwaivable. In that case, Davis, a supervisor who had tried to unionize his colleagues, brought a state-law fraud action against the union that had urged him to make his union organizing effort. Davis claimed that labor union representatives had falsely represented that the union could protect him from his employer's retaliatory dismissal. *Id.* at 385, 106 S.Ct. at 1909. After the jury found for Davis and awarded him damages, the union, for the first time, argued pre-emption in a motion for judgment n.o.v. The union argued that Davis's fraud claim sought to hold the Union liable for conduct "arguably subject to" § 7 or § 8 of the National Labor Relations Act, 29 U.S.C. § 157 or § 158, namely, conduct that the NLRA "protects" or "prohibits." Hence, the union added, under well-established precedent, the courts could not adjudicate the lawfulness of the activity, and "must defer to the competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *Id.* at 390, 106 S.Ct. at 1912 (quoting *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 245, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959)).

The Supreme Court said in *Davis* that the union's "pre-emption" defense was "jurisdictional" in nature. *See* 476 U.S. at 391, 106 S.Ct. at 1912. "Pre-emption" in this context meant that Congress had deprived the courts of jurisdiction to decide certain kinds of cases, *id.,* namely those cases involving underlying "conduct" that the National Labor Relations Act, "arguably protected or prohibited." *Id.* at 394, 106 S.Ct. at 1914 (citing *Garmon* ). Presumably, Congress did so because it feared that *court* decision making, rather than *National Labor Relations Board* decision making, in such cases would threaten the development of uniform labor relations law, a task it left primarily to the Board. *Id.* at 389, 106 S.Ct. at 1911 (citing *Garner v. Teamsters Local Union No. 776,* 346 U.S. 485, 490–91, 74 S.Ct. 161, 165–66, 98 L.Ed. 228 (1953)). Because the pre-emption defense was "jurisdictional" in such cases, it was not a "waivable defense." 476 U.S. at 389, 106 S.Ct. at 1911. Rather, pre-emp-

tion amounted to a "non-waivable foreclosure of the state court's very jurisdiction to adjudicate." *Id.*

### D. *Our Analysis*

 Ultimately, we must decide whether *Davis* governs the case before us. Pre-emption is a matter of congressional intent, as embodied, explicitly or implicitly, in a particular federal statute. *See Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443 (1978). And, as Westvaco concedes, the Supreme Court in *Davis* considered Congress's intent as embodied, not in the statute now before us (§ 301 of the Labor Management Relations Act), but in a different statute, namely, § 7 and § 8 of the National Labor Relations Act, which it had previously interpreted as pre-empting suits involving "arguably protected or prohibited" conduct. *Davis*, 476 U.S. at 394, 106 S.Ct. at 1914 (citing *Garmon* ). Nonetheless, Westvaco says, the two statutes are highly analogous: the NLRA reflects a congressional intent that the Board (not courts) develop uniform federal labor laws; the LMRA reflects a congressional intent that arbitrators (not courts) develop and explain the meaning of terms in a collective bargaining agreement. *Cf. Republic Steel Corp. v. Maddox*, 379 U.S. 650, 653, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965) ("Congress has expressly approved contract grievance procedures as a preferred method for settling disputes and stabilizing the 'common law of the plant.' "). If the Supreme Court *has held* in *Davis* that Congress (in the NLRA) removed court jurisdiction to decide matters that normally would go to the Board in the first instance, so it *would hold* in a case like this one that Congress (in the LMRA) removed court jurisdiction to decide matters that normally would go to arbitrators in the first instance. "For purposes of § 301 [*i.e.*, LMRA] pre-emption," argues Westvaco, "the exclusive grievance and arbitration process under the Agreement is the analog to the exclusive jurisdiction of the NLRB for purposes of *Garmon* [*i.e.*, NLRA] pre-emption." Consequently, Westvaco concludes, LMRA pre-emption, like NLRA pre-

emption, is a claim that a party can raise at any time, even after the jury has returned a verdict.

Although we find Westvaco's argument a strong one, ultimately we disagree with it, for several reasons. First, as we noted in *Brown v. Trustees of Boston University*, 891 F.2d 337 (1st Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990), the Supreme Court carefully limited its holding in *Davis.* It made clear that it was describing Congress's "jurisdictional" intent in respect to §§ 7 and 8 of the NLRA, not other statutes. *See Brown,* 891 F.2d at 363. Moreover, the Court spoke of Congress's intent, in respect to pre-emption by §§ 7 and 8 of the NLRA, as involving "a choice-of-forum rather than a choice-of-law question." *Davis,* 476 U.S. at 391, 106 S.Ct. at 1912. And, it warned in a footnote that

> our decision today does not apply to pre-emption claims generally but only to those pre-emption claims that go to the State's actual adjudicatory or regulatory power as opposed to the State's substantive laws. The nature of any specific pre-emption claim will depend on congressional intent in enacting the particular pre-empting statute.

*Id.* at n. 9.

Second, the basic rationale for *Davis*, the basic reason why the Court found a strong congressional intent to oust the state court as a forum, stemmed from its belief (expressed in *Garmon* ) that Congress intended to "confide primary interpretation and application of its rules *to a specific and specially constituted tribunal,*" *id.* at 389, 106 S.Ct. at 1911 (quoting *Garner,* 346 U.S. at 490, 74 S.Ct. at 165) (emphasis added), namely, the National Labor Relations Board, which would follow a specially constituted procedure, which would develop knowledge of, and expertise in, labor relations, and which would develop and apply nationally uniform labor-relations principles and practice. And, the Court apparently believed that Congress intended this *to the point* where Congress (sub silentio in the statutes) refused to permit parties to submit such a dispute to the courts even

where the parties themselves wished to do so. *See Davis*, 476 U.S. at 391, 106 S.Ct. at 1912.

 This rationale does not apply in the case of § 301 of the LMRA—at least it does not apply in one critical, outcome-determining aspect. Westvaco argues that the "alternative forum" in this case is the grievance and arbitration procedure provided for in the collective bargaining agreement. We concede that arbitrators often do possess special expertise, and that federal labor policy favors arbitration as a method of settling disputes. *See, e.g.*, 29 U.S.C. § 173(d); *Republic Steel Corp.*, 379 U.S. at 653, 85 S.Ct. at 616; *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596–97, 80 S.Ct. 1358, 1360–61, 4 L.Ed.2d 1424 (1960); *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578–82, 80 S.Ct. 1347, 1350–53, 4 L.Ed.2d 1409 (1960). We do not concede, however, that Congress believed this fact so important, important enough, important *to the point* that *Congress wished to foreclose parties from submitting such disputes to judicial fora.* We are fairly certain about this because the law quite clearly permits parties to opt out of arbitration-based dispute-resolving mechanisms, and to have courts decide those disputes instead. For one thing, the law does not require that collective bargaining agreements provide for grievance and arbitration procedures. *See United Steelworkers of Am. v. American Mfg. Co.*, 363 U.S. 564, 570, 80 S.Ct. 1343, 1367, 4 L.Ed.2d 1403 (1960) (Brennan, J., concurring). Where the collective bargaining agreement does not do so, courts, not arbitrators, decide disputes arising under that agreement. For another thing, even if an agreement does provide for such mechanisms (as is the case here), the parties to a dispute may waive the benefit of these procedures. *See Jones Motor Co. v. Teamsters Local Union No. 633*, 671 F.2d 38, 42–44 (1st Cir.), *cert. denied*, 459 U.S. 943, 103 S.Ct. 257, 74 L.Ed.2d 200 (1982); *Reid Burton Constr., Inc. v. Carpenters Dist. Council of S. Colo.*, 614 F.2d 698, 702 (10th Cir.), *cert. denied*, 449 U.S. 824, 101 S.Ct. 85, 66 L.Ed.2d 27 (1980); *E.T. Simonds*

*Constr. Co. v. Local 1330, Int'l Hod Carriers*, 315 F.2d 291, 295 (7th Cir.1963). They may ask a court to resolve the contract-interpretation dispute instead. These cases demonstrate that LMRA § 301 pre-emption (unlike NLRA §§ 7 and 8 pre-emption) concerns what *law* a decision maker must apply, not what *forum* must decide the dispute. Given the typically more local impact of decisions of the former, § 301 kind of case (compared with the typically more important NLRA § 7 or 8 kind of case), one can understand *why* that is so. Regardless, the *Davis* court made clear that its holding does *not* govern choice-of-law questions.

Third, the weight of court of appeals authority tends to support us and seems contrary to Westvaco's view. The Ninth Circuit, in *Johnson v. Armored Transport of California, Inc.*, 813 F.2d 1041 (9th Cir. 1987) (Wallace, J.), concluded that § 301 pre-emption (in the Supreme Court's terminology) was a matter of what *law* ought not to apply (namely, federal collective-bargaining-agreement law or state tort law) rather than of what *forum* ought (or ought not) to apply it. Consequently, it held that the parties could waive the defense, and that they did not possess an absolute right to raise it for the first time on appeal. *Id.* at 1043–44. Similarly, the Sixth and Seventh Circuits have held that a defendant may raise a § 301 pre-emption argument for the first time on appeal in *special circumstances*, thereby holding that the claim is not one that parties had an *absolute right* to raise at any time. *See Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210, 1215 (6th Cir.), *cert. denied*, 484 U.S. 820, 108 S.Ct. 77, 98 L.Ed.2d 40 (1987); *National Metalcrafters, Div. of Keystone Consol. Indus. v. McNeil*, 784 F.2d 817, 825–26 (7th Cir.1986).

Westvaco says that two other Ninth Circuit cases hold the contrary, namely that the defense is not waivable, that parties have an absolute right to raise it at any time. *Harris v. Alumax Mill Products, Inc.*, 897 F.2d 400, 402 (9th Cir.) (Wallace, J.), *cert. denied*, —— U.S. ——, 111 S.Ct. 102, 112 L.Ed.2d 73 (1990); *Stallcop v.*

*Kaiser Foundation Hospitals,* 820 F.2d 1044, 1048 (9th Cir.), *cert. denied,* 484 U.S. 986, 108 S.Ct. 504, 98 L.Ed.2d 502 (1987). But that is not what these cases hold. We agree that both cases use the protean word "jurisdiction." But, neither case involved waiver; both cases dealt with the question whether the district court had properly held that § 301 pre-empted the plaintiff's state-law claim, and whether there was a sufficient basis for "arising under" jurisdiction after removal. Indeed, Judge Wallace, the author of *Harris,* also wrote *Johnson* (the case we discussed at p. 39, *supra,* holding directly against Westvaco), yet he suggested no contradiction between the two.

Westvaco also points to a Third Circuit case, *Carpenters Health and Welfare Fund of Philadelphia and Vicinity v. Kenneth R. Ambrose, Inc.,* 665 F.2d 466 (3d Cir.1981), in which the court said that "if the issue of pre-emption were not jurisdictional, a strong case for waiver could be made on [the] facts." *Id.* at 469–70. Yet, this single sentence, *dicta* in context, made without analysis, in respect to a matter that the parties perhaps did not argue (the case involved other issues), makes that case weak support for Westvaco's claim.

Finally, Westvaco directs our attention to a recent Supreme Court case, *Ingersoll–Rand Co. v. McClendon,* —— U.S. ——, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990), in which the Court reversed a judgment from the Texas Supreme Court that had held that ERISA did not pre-empt the tort action under Texas law before it. Westvaco says that the Texas Supreme Court raised the pre-emption issue on its own, and that the United States Supreme Court never stopped to consider if the defendant had waived the pre-emption defense by failing to raise it below. Hence, Westvaco says, ERISA pre-emption (which, it says, is like § 301 pre-emption) must be a matter that the parties can raise at any time.

■ The short answer to this argument is that the Supreme Court never discussed waiver; and we do not normally take Supreme Court opinions to contain holdings on matters the Court did not discuss and

which, presumably, the parties did not argue. *See Cousins v. Secretary of the U.S. Dep't of Transp.,* 880 F.2d 603, 608 (1st Cir.1989) (en banc). Moreover, the respondent in the Supreme Court was free to waive application of the waive-or-raise rule itself. In fact, if one examines pre-emption by ERISA, one finds that the cases generally hold that ERISA pre-emption is a waivable defense. *See, e.g., Dueringer v. General Am. Life Ins. Co.,* 842 F.2d 127, 130 (5th Cir.1988); *Gilchrist v. Jim Slemons Imports, Inc.,* 803 F.2d 1488, 1497 (9th Cir.1986).

For these reasons, we agree with the Ninth Circuit and with what we take as the holding implicit in the approach of the Sixth and Seventh Circuits, namely, that in an appropriate case, a party can waive § 301 pre-emption; the parties do not have an absolute right to raise that argument at any stage they wish in the proceedings.

■ Westvaco has one further important argument. It says that even if a party, by not raising the pre-emption defense, can waive it, courts sometimes forgive and overlook a failure to raise a legal issue at the proper time. They may make an exception and consider the matter anyway. And, Westvaco adds, a court should prove more willing to make an exception from the normal waiver rule when a § 301 pre-emption question is at issue than in the ordinary case.

Westvaco may well be right on this point. The Sixth Circuit reached, and decided, a pre-emption question where it might otherwise have found waiver because of the "compelling policy in favor of uniform application of federal law in actions to en force labor contracts...." *Apponi,* 809 F.2d at 1215. The Seventh Circuit did the same while referring to a host of special circumstances that made the exception proper, such as the appellant's having raised a very similar issue in the district court, and tardiness not having prejudiced the parties. *See National Metalcrafters,* 784 F.2d at 825–26.

Even on so favorable an assumption, however, Westvaco cannot prevail here, for the circumstances simply do not call for an

exception. Westvaco could have raised pre-emption at any point before the jury deliberated. There is no good reason for its neglect. The unfairness is obvious and aggravated here, by the fact that, at least arguably, Mrs. Sweeney might have tried to reshape her case to avoid any need for contract interpretation had she known of the problem sooner.

At the same time, the risk that calls for pre-emption—the risk that terms in the bargaining agreement will take on different meanings under state and federal law—here is fairly minimal. *Cf. Local 174, Teamsters of Am. v. Lucas Flour Co.*, 369 U.S. 95, 104, 82 S.Ct. 571, 577, 7 L.Ed.2d 593 (1962) (describing the disruptive effect on labor negotiations if parties had to choose words designed to achieve similar meanings where "two or more systems of law ... might someday be invoked in enforcing the contract."). The case in its present posture does not offer a specific interpretation of any word contained in the relevant collective bargaining agreement. Nor is there the slightest indication that any third party, any other worker, any union, any employer, is adversely affected by any collective bargaining agreement interpretation here at issue.

For these reasons, even taking a very lenient view of what constitute "unusual," waiver-excusing, circumstances (in light of the federal labor-law policies at issue), we cannot find such circumstances present. We are not prepared to overlook Westvaco's failure to raise the pre-emption issue in a timely way in the district court. Thus, we find that it has waived its right to assert pre-emption.

### IV

#### *Diversity Jurisdiction*

■ During these appellate proceedings, Westvaco for the first time pointed out that one of the individual defendants, Ronzoni, was at all relevant times a citizen of Massachusetts. Since the plaintiff, Dolores Sweeney, was also, and, presumably, still is, a citizen of Massachusetts, there is no diversity of citizenship between these two parties. And, this fact—lack of "complete diversity" between the parties—deprives the federal courts of jurisdiction over the lawsuit. *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch.) 267, 2 L.Ed. 435 (1806). Despite the surprisingly late hour at which anyone noticed the jurisdictional defense, we cannot proceed in the absence of diversity jurisdiction, and no one has pointed to any other basis for jurisdiction available in this case.

■ The plaintiff has asked us, however, to dismiss Ronzoni from the case. The Supreme Court has made clear that appellate courts possess power analogous to the power of district courts under Fed.R. Civ.P. 21 to dismiss nondiverse parties in order to maintain jurisdiction, *see Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 109 S.Ct. 2218, 2225–26, 104 L.Ed.2d 893 (1989), though the Court has also advised us to exercise that power "sparingly" and to "consider whether the dismissal of a nondiverse party will prejudice any of the parties in the litigation." *Newman–Green*, 109 S.Ct. at 2226.

■ We believe that this is an appropriate case for exercise of the power to dismiss a nondiverse party. The presence of Ronzoni in this suit has given the plaintiff no significant procedural advantage she could not have obtained without him. Even without Ronzoni's presence as a party, Mrs. Sweeney could have conducted the same discovery, called Ronzoni as a witness, and introduced all the evidence that, in fact, she presented to the jury. *Cf. Newman–Green*, 109 S.Ct. at 2226 (court must take into consideration whether opponent was able to obtain discovery materials that would not have been available without the diversity spoiler); *Levering & Garrigues Co. v. Morrin*, 61 F.2d 115, 121 (2d Cir.1932), *aff'd*, 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062 (1933) ("there is authority for allowing the record to stand as already taken, and to enter a decree thereon against the [remaining defendants], provided it appears that all the evidence remains equally admissible with the dismissed defendants out").

■ Westvaco makes two contrary arguments. First, it says that, the Supreme

Court's decision in *Newman–Green* notwithstanding, this court lacks the power to dismiss Ronzoni from the suit. It bases its argument upon the language of the removal statute. (The reader will recall that Westvaco removed this case from state to federal court.) This language says that

[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case *shall* be remanded.

28 U.S.C. § 1447(c) (emphasis added). The word "shall," in Westvaco's view, means that we must remand this case to state court; we cannot dismiss the non-diverse party and keep the case.

We find this argument unpersuasive, for we see no reason why Congress, in using the word "shall," would have intended to deprive a federal court of the power to apply Rule 21, or any other federal rule or other ordinary procedural power. One would expect the removal statute to foresee a case removed to federal court as there being subject to the federal court's ordinary procedural power. And, linguistically speaking, one can easily read the statutory sentence in question as meaning "lacks subject matter jurisdiction after federal courts have appropriately exercised any or all appropriate procedural powers including the power to add, or drop, other parties." Indeed, a later part of the removal statute, § 1447(e) (requiring remand when the district court, for example, wishes to add a nondiverse party), foresees exercise of the court's Rule 21 power to add parties, and thereby implies the related power to drop them. The history of the removal provision suggests that Congress added the mandatory word "shall" for an unrelated purpose, namely to make clear that the court must *remand*, not *dismiss*, a removed suit that it lacks power to hear. (The predecessor of § 1447(e) gave a federal court the option to *"dismiss* the suit or *remand* it to the court from which it was removed as justice may require." *See* Act of March 3, 1875, ch. 137, § 5, 18 Stat. 472 (emphasis added).) Nothing in that history reflects any intent to deprive courts of the authority to apply other potentially applicable rules of procedure.

Westvaco's second argument is that it is unfair to dismiss Ronzoni but keep the verdict because, without Ronzoni in the case, the jury might not have returned so large a verdict. It might have thought it unfair of Mrs. Sweeney to sue only the company and not the actual perpetrator of her husband's suffering. Such a consideration, however, is speculative. One can, as easily, argue that the jury, seeing Ronzoni present and available as a target for its verdict, would have proved less likely to return so large a verdict against Westvaco. We do not believe that so speculative a consideration offers a determinative reason for refusing to exercise the authority that the Supreme Court, in *Newman–Green*, has held that we possess.

Given the facts that the parties had the legal power to try this case as a simple tort suit, that Westvaco (until it lost) chose to do so, that plaintiff spent considerable time, effort, and expense in gaining victory, we believe it fair to hold the parties to the legal theories they asserted in this case prior to the jury's award. We have the legal power to require this result. And, we have exercised that power.

The defendant Ronzoni is dismissed from this action. The judgment of the Magistrate Judge is vacated. The case is remanded with instructions to reinstate the jury's verdict against the other defendants.

*So ordered.*