FILED

02/13/2018

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 17-0222

DA 17-0222

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2018 MT 25

S & P BRAKE SUPPLY, INC.,

      Petitioner and Appellant,

    v.

DAIMLER TRUCKS NORTH AMERICA, LLC,

      Respondent and Appellee.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV-15-0788
Honorable Rod Souza, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Michael F. McGuinness, Patten, Peterman, Bekkedahl & Green, PLLC;
Billings, Montana

    For Appellee:

        Marcia Davenport, Crowley Fleck, PLLP; Helena, Montana

        Roberta F. Howell, Foley & Lardner; Madison, Wisconsin

Submitted on Briefs:  November 15, 2017

Decided:  February 13, 2018

Filed:

_____
                Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 S & P Brake Supply, Inc. (S&P) appeals from the order upon judicial review entered by the Thirteenth Judicial District Court, Yellowstone County, which affirmed the Final Decision of the Department of Justice that approved, upon good cause, termination of S&P's franchise agreement with Appellee Daimler Trucks North America, LLC (Daimler). We affirm, and address the following issue:

> *Did the District Court err by affirming the final agency determination of good cause to terminate the franchise agreement?*

### FACTUAL AND PROCEDURAL BACKGROUND

¶2 S&P is a brake remanufacturing business that also sells trailers. In 2000, S&P became an authorized dealer of Western Star Trucks. Western Star is a "high-end" brand of semi-trucks. S&P operated its Western Star franchise under the name Rocky Mountain Western Star, subject to a Dealer Agreement (the Agreement) with Western Star's parent company, Daimler.

¶3 Under the Agreement, S&P was authorized to purchase Western Star semi-trucks and their components at a reduced price for resale, and sell and service Western Star products under manufacturer warranty. The Agreement permitted S&P to continue its other business interests, but required S&P to make its best effort as a franchisee to maximize the sale of Western Star trucks in the franchisee's designated area of responsibility (AOR), which was Yellowstone County, Montana. The Agreement was supplemented each year with an Annual Operating Requirement Addendum (AORA), which provided minimum sale and service targets for S&P.

2

¶4     Between 2009 and 2013, S&P sold a total of 11 Western Star trucks and averaged $400,000 in parts and service sales each year. Only two of the trucks in that period were sold in Yellowstone County. In April 2012, Daimler sent S&P a letter identifying deficiencies under its franchise that needed to be corrected, including failure to adequately promote and sell Western Star trucks, failure to hire necessary personnel, and failure to submit required financial statements.

¶5     In September of 2013, Daimler, pursuant to the Montana Dealer Act, served S&P and the Montana Department of Justice, Motor Vehicle Division (Department), with notice of its intention to terminate the Agreement and S&P's franchise. S&P filed an objection with the Department, asserting that Daimler did not have good cause to terminate the franchise, as required by the Act.

¶6     In January 2015, a contested case hearing on Daimler's proposed termination of S&P's franchise was conducted before Department Hearing Officer Sarah M. Clerget. Hearing Officer Clerget issued finding of facts, conclusion of laws, and a proposed order that concluded Daimler had good cause to terminate S&P's Western Star franchise. S&P filed exceptions and, after receiving oral arguments from the parties, the Department issued a Final Decision that adopted the proposed order.

¶7     S&P filed a petition for judicial review of the Department's decision in the District Court, which affirmed the Department's Final Decision. S&P appeals, arguing that the District Court erred by determining that Daimler met its burden to prove good cause for termination of the franchise agreement.

**STANDARD OF REVIEW**

¶8 Pursuant to the Montana Administrative Procedure Act, a district court's review of an agency decision is confined to the record. Section 2-4-704(1), MCA. "The court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." Section 2-4-704(2), MCA. A "court may reverse or modify the decision if substantial rights of the appellant have been prejudiced" because:

> (a) the administrative findings, inferences, conclusions, or decisions are:
>
> (i) in violation of constitutional or statutory provisions;
>
> (ii) in excess of the statutory authority of the agency;
>
> (iii) made upon unlawful procedure;
>
> (iv) affected by other error of law;
>
> (v) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record;
>
> (vi) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion . . . .

Section 2-4-704(2), MCA. These standards of review apply "to both the District Court's review of the agency's decision and this Court's subsequent review of the District Court's decision." *Blaine Cnty. v. Stricker*, 2017 MT 80, ¶ 16, 387 Mont. 202, 394 P.3d 159 (citations omitted). "A reviewing body's standard on review 'is not whether there is evidence to support findings different from those made by the trier of fact, but whether substantial credible evidence supports the trier's findings.'" *Blaine Cnty.*, ¶ 26 (citations omitted).

4

**DISCUSSION**

¶9 *Did the District Court err by affirming the final agency determination of good cause to terminate the franchise agreement?*

¶10 The Montana Dealer Act regulates the relationship between new motor vehicle dealers and franchisors in the State of Montana. *See* §§ 61-4-201 et seq., MCA (2013);[1] *Rimrock Chrysler, Inc. v. DOJ*, 2016 MT 165, ¶ 36, 384 Mont. 76, 375 P.3d 392. "[A] franchisor may not cancel, terminate, or refuse to continue the franchise unless the franchisor has cause for termination or noncontinuance." Section 61-4-205(1), MCA.

¶11 Upon notice that a franchisor seeks to terminate the franchise, the franchisee may file an objection with the Department. Section 61-4-206(1)(a), MCA. If the objection is timely filed, the Department must initiate a contested case proceeding pursuant to the Montana Administrative Procedures Act. Section 61-4-206(2), MCA. The decision of the Department may be reviewed by the district court, § 61-4-206(7), MCA, and the franchise agreement continues in effect during the proceedings, including appellate review, § 61-4-206(8), MCA.

¶12 At the contested case hearing, the franchisor has the burden of proving that good cause exists to terminate the existing franchise. *Hi-Tech Motors, Inc. v. Bombardier Motor Corp. of Am.*, 2005 MT 187, ¶ 17, 328 Mont. 66, 117 P.3d 159 (citing § 61-4-206(3),

---

[1] The Legislature amended relevant parts of the Montana Dealer Act several times during the life of the subject Franchise Agreement and the related proceedings, including in 2003, 2009, 2013 and 2017. The parties variously quote different versions of the Act, probably unintentionally, as they offer no discussion about which version is applicable. The Department and District Court applied the 2013 version of the Act, and neither party challenges this on appeal. Therefore, all citations herein to the Montana Dealer Act are to the 2013 version, which includes the changes made by the 2013 Legislature.

5

MCA). The Department determines whether good cause has been established pursuant to "the existing circumstances, including but not limited to," the following:

(a) the franchisee's sales in relation to the market;

(b) investment necessarily made and obligations incurred by the franchisee in the performance of the franchisee's part of the franchise;

(c) permanency of the investment;

(d) whether it is injurious to the public welfare for the business of the franchisee to be discontinued;

(e) whether the franchisee has adequate new motor vehicle facilities, equipment, parts, and qualified management, sales, and service personnel to reasonably provide consumer care for the new motor vehicles sold at retail by the franchisee and any other new motor vehicle of the same line-make;

(f) whether the franchisee refuses to honor warranties of the franchisor to be performed by the franchisee if the franchisor reimburses the franchisee for warranty work performed by the franchisee pursuant to this part;

(g) except as provided in subsection (2), actions by the franchisee that result in a material breach of the written and uniformly applied requirements of the franchise that are determined by the department to be reasonable and material; and

(h) the enforceability of the franchise from a public policy standpoint, including issues of the reasonableness of the franchise's terms and the parties' relative bargaining power.

Section 61-4-207(1), MCA. As indicated by the "including but not limited to" language of the statute, the listed circumstances, or factors, are not exclusive, and other information may be considered. While the Department is thus granted latitude in the good cause determination, the statute also provides a list of factors that may not "constitute good cause for the termination or noncontinuance of a franchise," as follows:

6

(a)    a change in ownership of the franchisee's dealership;

(b)    the fact that the franchisee refused to purchase or accept delivery of a new motor vehicle, part, accessory, or any other commodity or service not ordered by the franchisee;

(c)    the failure of a franchisee to change location of the dealership or to make substantial alterations to the use or number of franchises or the dealership premises or facilities; or

(d)    the desire of a franchisor or a franchisor's representative:

(i)    for market penetration; or

(ii)   to reduce the number of the franchisor's or franchisor's representative's franchises or dealer locations.

Section 61-4-207(2), MCA.

¶13    S&P argues Daimler did not meet its burden at the contested case hearing to show good cause to terminate the franchise, and the District Court erred in its assessment of the Department's determination. Below, we take up S&P's arguments regarding the good cause determination.

### a. S&P's sales in relation to the market, § 61-4-207(1)(a), MCA.

¶14    Noting that § 61-4-201(1), MCA, provides that "the relevant market area of a franchise is the county or counties in which the franchisee is located," S&P argues that an analysis of its sales performance is restricted to evidence related to Yellowstone County, and that the Department erred by considering Daimler's analysis of other evidence.

¶15    Daimler established that S&P had failed to meet new truck sales objectives under its annual AORA for the years between 2009 and 2012, which are set for all Western Star dealers using an algorithm that considers market factors and the population of a dealer's

7

area of responsibility. In 2009 and 2010, S&P sold no trucks in Yellowstone County. Daimler offered its analysis of S&P's "dealer market share," which compared how many trucks S&P sold in its AOR to how many Western Star trucks were annually registered in Yellowstone County, to measure how well S&P was reaching and serving local customers. Of the seven Western Star trucks registered in Yellowstone County from 2009 to 2013, only two had been sold by S&P, an indicator to Daimler that S&P was not well serving its market, as the majority of customers were purchasing their Western Star trucks elsewhere. This evidence was premised upon S&P's performance in Yellowstone County.

¶16 Daimler also argued S&P's "dealer market share" was low compared to Western Star's "regional market share," a factor which is compiled from national truck registration data to compare S&P's sales performance in its AOR with Western Star's regional performance. While this assessment included evidence from outside the Yellowstone County franchise location, the District Court properly noted that limiting the evidence to only Yellowstone County would not allow a comparison to other dealers where there is only one dealer in a county, reasoning that "when only one franchisee exists in a market, expanded data must be considered. Otherwise, a lone franchisee could never be terminated, and the statute would be rendered meaningless." Further, as indicated above, § 61-4-207(1), MCA, permits consideration of additional information beyond the stated factors.

¶17 The evidence focused on S&P's performance in Yellowstone County and was properly considered. The Department found, "[t]he bottom line is that S&P's sales were deficient no matter which way one analyzed the data," and this determination was

8

supported by substantial evidence. Thus, the District Court did not err by upholding the Department's determination on this factor.[2]

### b. *Daimler's desire for market penetration, § 61-4-207(2)(d)(i), MCA.*

¶18 S&P argues that the sales requirements set forth in the AORA were intended to increase market penetration, and therefore violated § 61-4-207(2)(d)(i), MCA, which provides that such purpose cannot constitute good cause for termination of the franchise. Daimler freely admits that the purpose of the AORAs was to increase market penetration.

¶19 The interface between § 61-4-207(1)(a), MCA, which requires consideration of "the franchisee's sales in relation to the market," and § 61-4-207(2)(d)(i), MCA, which prohibits the franchisor's desire for greater "market penetration" to be a basis for good cause, makes application of the statute challenging. We can safely assume that a franchisor's common desire will be to obtain greater market penetration. Interpreting these provisions together, we conclude that objective evidence of a franchisee's deficient sales in relation to the market is an appropriate consideration, while a naked desire for a greater market share by a franchisor, without more, is an inappropriate basis to establish good cause.

¶20 The Department noted that, while "there may have been some evidence that [Daimler] had some desire for market penetration," it was insufficient "to overcome the

---

[2] S&P argues the Department erred by considering only the trucks it sold that were registered in Yellowstone County in determining its "dealer market share," because S&P had no control over where end users registered their vehicles. We understand the point, especially given that Yellowstone County is a service hub for customers in surrounding counties. However, all of S&P's truck sales, wherever registered, were counted toward its sale targets, so all sales were considered in some manner. As a whole, the evidence considered by the Department appropriately assessed S&P's Yellowstone County performance.

substantial evidence of good cause" provided by Daimler. Daimler presented objective data that indicated S&P's sales were deficient, and the "market penetration" factor did not preclude consideration of that evidence.

### c. S&P's investment, § 61-4-207(1)(b) and (c), MCA.

¶21 Section 61-4-207(2)(b) and (c), MCA, respectively, require consideration of the "investment necessarily made and obligations incurred by the franchisee in the performance of the franchisee's part of the franchise," and the "permanency of the investment . . . ." The Department found that "none of S&P's investments were Western Star specific and S&P can continue to utilize all the investments it made if its Western Star Dealer Agreement is terminated." Additionally, it found that S&P's investments "have never been used exclusively for Western Star," but were also used for its other business interests.

¶22 S&P argues the Department erred as a matter of law by considering the "exclusivity" of its investments, and whether S&P could use their facilities for other ventures if the franchise were to be cancelled, because the statute only requires consideration of whether investments were made and their permanency. However, as noted above, these factors are not exclusive, and they can be considered in conjunction with other evidence. Further, the permanency of the investment under § 61-4-207(2)(c), MCA, can be considered in light of § 61-4-207(2)(b), MCA, which considers "investment necessarily made," a concept which could encompass the exclusivity of the investment. Therefore, we conclude there was no error.

### d. Material breaches by S&P, § 61-4-207(1)(g), MCA.

¶23 Section 61-4-207(1)(g), MCA, requires the Department to consider "actions by the franchisee that result in a material breach of the written and uniformly applied requirements of the franchise that are determined by the department to be reasonable and material . . . ." The Department determined that S&P breached the agreement in at least five ways: by failing to use best efforts to promote and sell Western Star trucks, failing to meet the new truck sales requires in the AORA, failing to use effective marketing strategies to promote Western Star truck sales, failing to adequately staff its sales team by failing to hire an outside salesperson, and failing to provide timely financial statements.

¶24 S&P argues the grounds cited are not material breaches because Daimler admitted that S&P's failure to meet sales goals was the primary reason for terminating the Agreement, and, therefore, the other breaches must be considered secondary. However, just because Daimler considered them to be secondary reasons for termination does not necessarily mean they were not material. "[A] substantial or material breach is one which touches the fundamental purposes of the contract and defeats the object of the parties in making the contract." *Norwood v. Serv. Distrib., Inc.*, 2000 MT 4, ¶ 29, 297 Mont. 473, 994 P.2d 25 (citations omitted).

¶25 S&P argues that using effective marketing strategies, specifically, submitting marketing plans and participating in marketing programs, was not a material provision of the Agreement, because the fundamental purpose of the Agreement was to sell trucks. However, the Agreement required S&P to use "its best efforts to promote and sell Western

11

Star trucks . . . ." S&P's use of the same unsuccessful marketing plan, which relied mostly on a sign, phonebook advertisements, and a vague effort of "direct solicitation," year after year, was found by the Department to not provide an advantageous strategy to sell Western Star trucks. This determination was properly based on the evidence.

¶26 S&P argues it was not a material breach to fail to hire an outside service sales person, as it instead designated an in-house service sales person. Daimler responds that, even if this was not, by itself, a material breach of the Agreement, this fact also goes to § 61-4-207(1)(e), MCA, which analyzes "whether the franchisee has adequate . . . qualified management, sales, and service personnel to reasonably provide consumer care . . . ." The Department concluded that S&P's poor sale performance was tied to inadequate personnel, making this a related factor favoring good cause. This determination is supported by substantial evidence.

¶27 S&P argues that failing to consistently send timely financial statements was not material because it was not fundamental to the sale of trucks. The District Court concluded that "[k]nowledge of a party's financial ability to perform its obligations under an agreement is material to that agreement." Given S&P's poor sales performance over a period of years, and Daimler's need to monitor S&P's progress, we agree with the District Court's conclusion that this was a material requirement under the Agreement.

### e. Injurious to the public welfare, § 61-4-207(1)(d), MCA.

¶28 This provision requires the Department to consider "whether it is injurious to the public welfare for the business of the franchisee to be discontinued . . . ."

12

Section 61-4-207(1)(d), MCA. S&P argues that, because it is the only Western Star dealer in the state, Montanans will be forced to go out of state to obtain Western Star dealer services. The evidence showed that very few Western Star vehicles were registered in Yellowstone County, and the Department found that the public would be better served by a franchise that was more engaged with local customers. Consequently, this factor did not weigh strongly against termination, if at all.[3]

¶29 The District Court did not err in upholding the Department's determination that good cause existed to terminate the franchise agreement.

¶30 Affirmed.

/S/ JIM RICE

We concur:

/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR
/S/ BETH BAKER

---

[3] S&P also offers a conclusory argument that the Department failed to consider its sales of parts and service, averaging $400,000 per year. It is correct that Daimler premised its case for termination of the franchise upon S&P's deficiencies in truck sales, rather than parts and service. However, S&P fails to demonstrate that its parts and service sales satisfactorily serviced the market, and whether these sales could and did play a role in offsetting the established deficiencies in its truck sales for purposes of the good cause determination.